No. 12-72135

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

JOHN PAUL REDDAM,

*Petitioner-Appellant,*

v.

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

On Appeal from the United States Tax Court

Docket No. 22557-08

The Honorable Joseph Robert Goeke

**BRIEF OF APPELLANT**

David W. Wiechert
Jessica C. Munk
Law Office of David W. Wiechert
115 Avenida Miramar
San Clemente, CA 92672
Telephone: (949) 361-2822

Attorneys for Petitioner-Appellant
John Paul Reddam

## TABLE OF CONTENTS

I.      JURISDICTIONAL STATEMENT ................................................1

II.     ISSUE PRESENTED ......................................................................1

III.    STATEMENT OF THE CASE ........................................................1

IV.     STATEMENT OF THE FACTS .....................................................2

V.      SUMMARY OF ARGUMENT........................................................9

VI.     ARGUMENT.................................................................................10

  A.    STANDARD OF REVIEW...........................................................10

  B.    THE TAX COURT ERRED IN FINDING THAT THE OPIS
        TRANSACTION LACKED ECONOMIC SUBSTANCE...........11

    1. The Tax Court Misapplied the Objective Analysis in  Concluding that OPIS
       Lacked Economic Substance......................................................12

    2. The Tax Court Erred In Finding Appellant Did Not Have a Business Purpose
       for Entering Into the OPIS Transaction.........................................16

        a.    The Tax Court Applied the Wrong Legal Standard.............................17

        b.    A Finding that Appellant had No Business Purpose Under the Correct
              Legal Standard Would be Clearly Erroneous .......................................19

          i.   Appellant Was Prudent in Evaluating the Potential Profitability of the
               DB Securities Transactions Involved in OPIS....................................20

          ii.  The Tax Court Erred in Finding Appellant Should Have Known the
               Options Were Materially Mispriced ....................................................28

  C.    IF THE COURT FINDS THAT THE TAX COURT CLEARLY ERRED
        ON EITHER ECONOMIC SUBSTANCE PRONG, DE NOVO REVIEW IS
        REQUIRED. ...............................................................................29

VII.    CONCLUSION ............................................................................30

VIII.   STATEMENT CONCERNING ORAL ARGUMENT ...............................30

i

## TABLE OF AUTHORITIES

**Cases**

*Altman v. Commissioner*, 469 Fed. Appx. 565, 2012 WL 605699 (9th Cir. 2012)

................................................................................................22, 23

*Altman v. Commissioner*, T.C. Memo 2008-290, 2008 WL 5330803 (2008), *rev'd*,

469 Fed. Appx. 565, 2012 WL 605699 (9th Cir. 2012)................................22, 23

*Bail Bonds v. Commissioner*, 820 F.2d 1543 (9th Cir. 1987) ..............11, 12, 15, 17

*Blum v. Commissioner*, T.C. Memo 2012-16, 2012 WL 129801 (2012)...............26

*Briskin v. Ernst & Ernst*, 589 F.2d 1363 (9th Cir. 1978) ...........................................2

*Casebeer v. Commissioner*, 909 F.2d 1360 (9th Cir. 1990) ........................12, 15, 17

*Frank Lyon Co. v. United States*, 435 U.S. 561 (1978)...........................................20

*Gefen v. Commissioner*, 87 T.C. 1471 (1986) ........................................................12

*Lewis & Taylor, Inc. v. Commissioner*, 447 F.2d 1074 (9th Cir. 1971).................13

*Loza v. American Heritage Life Ins. Co.*, 434 Fed. Appx. 687,  2011 WL 2066549

(9th Cir. 2011) ....................................................................................................2

*Pasternak v. Commissioner*, 990 F.2d 893 (6th Cir. 1993)..............................24, 25

*Portland Golf Club v. Commissioner*, 497 U.S. 154 (1990) ..................................12

*Rice's Toyota World v. Commissioner*, 752 F.2d 89 (4th Cir. 1985).....................17

*Sacks v. Commissioner*, 69 F.3d 982 (9th Cir. 1995) ...................................11, 13, 29

*Sekaquaptewa v. MacDonald* , 575 F.2d 239 (9th Cir. 1978)...................................2

*Washington Mut. Inc. v. United States*, 636 F.3d 1207 (9th Cir. 2011) ..................13

*Wolf v. Commissioner*, 4 F.3d 709 (9th Cir. 1993)....................................................11

## **Statutes**

15 U.S.C. § 80b-6 ......................................................................................................29

26 U.S.C. § 6512(a) .....................................................................................................1

26 U.S.C. § 7482(a) .....................................................................................................1

## I.    JURISDICTIONAL STATEMENT

John Paul Reddam ("Appellant") petitioned the United States Tax Court ("Tax Court") challenging the Internal Revenue Service's ("Appellee's") claim in the Notice of Deficiency ("Notice") disallowing losses on his 1999 tax return from his participation in Offshore Portfolio Investment Strategy ("OPIS"), a complex set of securities transactions designed by KPMG and others.[1]  ER 82.  The Tax Court had subject matter jurisdiction under 26 U.S.C. § 6512(a).  The Tax Court entered its decision on April 11, 2012, disregarding the OPIS losses on a singular basis, lack of economic substance.  ER 4.  Appellant filed his notice of appeal on July 3, 2012.  ER 1.  This Court has appellate jurisdiction under 26 U.S.C. § 7482(a).

## II.    ISSUE PRESENTED

The Tax Court held that the OPIS transaction was devoid of economic substance and should be disregarded for tax purposes.  The issue presented is whether the Tax Court erred in finding that OPIS lacked economic substance.

## III.    STATEMENT OF THE CASE

This case arises out of Appellant's participation in OPIS and the capital losses in the amount of $50,165,421 on his 1999 tax return related to that strategy.  On June 23, 2008, Appellee mailed a Notice to Appellant asserting taxes owing of

---

[1] The Excerpts of Record are cited as "ER."

$8,209,727 for 1999 based on disallowance of OPIS losses. ER 82. Appellant petitioned the Tax Court challenging Appellee's Notice. ER 404-08.

The Tax Court heard multiple days of testimony and received lengthy factual stipulations regarding whether Appellant's OPIS losses should be allowed under tax regulations and whether OPIS satisfies the economic substance doctrine. Without deciding whether the OPIS losses should be allowed under Title 26, the Tax Court held that Appellant's OPIS transaction lacked economic substance and the losses should be disregarded. This appeal challenges the sole holding of the Tax Court, namely, that Appellant's OPIS transaction lacked economic substance.[2]

## IV.    STATEMENT OF THE FACTS

Appellant has a Masters Degree and a Ph.D. in Philosophy. As an entrepreneur Appellant has built businesses. Appellant does not have training in accounting or the valuation of complex derivatives. ER 123-24. In 1985, Appellant began in the field of home mortgages and several years later started a residential mortgage company called SC Funding. ER 124-25, 127-29. In 1994, Appellant retained KPMG to audit his business and he met KPMG partner Scott Carnahan. SC Funding's CFO had deserted the company leaving behind $2

---

[2] This Court will not reach the merits of issues not decided by the lower court. *See Briskin v. Ernst & Ernst*, 589 F.2d 1363, 1370 (9th Cir. 1978); *Sekaquaptewa v. MacDonald*, 575 F.2d 239, 247 (9th Cir. 1978); *Loza v. American Heritage Life Ins. Co.*, 434 Fed. Appx. 687, 690, 2011 WL 2066549, *3 (9th Cir. 2011).

2

million in hidden liabilities. ER 129-30. Due to this malfeasance, SC Funding collapsed and Appellant sold the company for virtually nothing. ER 129-31.

In 1995, Appellant formed residential mortgage company DiTech Funding Corp., as well as related service entities, DiTech Escrow Corp., and DiTech Real Estate Corp. (collectively "DiTech"). ER 60. Appellant was the owner and CEO of DiTech. ER 60. DiTech engaged in the business of originating, underwriting, purchasing, selling and servicing residential mortgage loans. ER 60. Appellant utilized KPMG for his personal and business accounting needs. ER 133-34.

By 1998, DiTech had thrived with about 700 employees generating around $45 million in annual revenue. ER 60. Appellant began considering options for monetizing the DiTech venture including a public offering. However, due to crises in the financial markets, Appellant tabled the option of taking DiTech public. ER 138-41. In summer 1998, Appellant hired Carnahan as president of DiTech. ER 137, 168. That fall, GMAC Mortgage Corporation ("GMAC") approached Appellant about a DiTech purchase. An asset purchase agreement was finalized in April 1999. ER 61, 142-46. The purchase price consisted of a "closing payment" and an "earn out" payment over a few years. GMAC paid DiTech an approximately $70 million closing payment in 1999. Appellant was entitled to future earn out payments in excess of $170 million. ER 61.

3

Before the sale of DiTech in 1998, Carnahan introduced Appellant to KPMG partner Carl Hasting who was promoting OPIS, an investment strategy developed by KPMG with favorable tax implications. ER 149. In 1998 and early 1999, Appellant had a series of meetings with Hasting and other officials of KPMG. During these meetings, Hasting described OPIS as a complicated series of transactions involving a bullish investment in foreign bank stock and options that could yield large returns as well as tax benefits. ER 150-55, 160, 169-70. Appellant personally researched the European market generally, and Deutsche Bank ("DB") specifically, as well as studied detailed materials from Hasting regarding the potential profitability of a DB investment including a transaction summary with a stock performance chart. ER 154-57, 161, 224-46.

After learning about OPIS and doing his own research, Appellant had Carnahan contact other firms to see if they had similar products. Carnahan spoke to multiple firms. ER 170. Both Pricewaterhouse and Deloitte had similar products. ER 171. Carnahan spoke to many KPMG tax partners who unanimously supported the OPIS tax technology. ER 173-74. In addition, the Washington National Tax Group at KPMG had issued a more likely than not opinion that Carnahan viewed as very valuable as the tax technologists there were tough and competent. ER 175-77. Carnahan was also impressed that a prestigious national law firm issued the same opinion. ER 177. Carnahan suggested that Appellant

4

seek another opinion regarding the viability of the KPMG tax opinion. ER 172. Appellant deemed two legal opinions to be sufficient.

Appellant entered into OPIS for the dual purpose of earning a profit and gaining a tax benefit. ER 155-59. OPIS was developed by KPMG and implemented with the assistance of Presidio Investment Advisors ("Presidio") and DB. ER 61. DB assisted by carrying out the necessary trades and loans. ER 180-81. Presidio, as Appellant's investment advisor, directed the OPIS trading activity. ER 187. After selling DiTech in April of 1999, upon the advice of KPMG, Appellant formed the J. Paul Reddam Trust ("Reddam Trust" or "Appellant") on April 27, 1999. ER 61, 63. On May 13, 1999,[3] the Reddam Trust entered into an Investment Advisory Agreement with Presidio. ER 64.

In addition to the Reddam Trust, KPMG and Presidio involved the following entities in facilitating OPIS: (i) a foreign (non-U.S.) taxpayer Clara Street, LLC ("Clara LLC"); (ii) a Cayman Islands corporation named Clara Street Ltd. ("Clara Ltd."); (iii) and a Cayman Islands limited partnership owned by Clara LLC and Clara Ltd. named Cormorant LP ("Cormorant"). ER 64-65. Cormorant's partnership agreement provided that Clara LLC was the limited partner; Clara Ltd. was the general partner. ER 65. The Reddam Trust, Clara LLC, Clara Ltd., and Cormorant utilized DB accounts. ER 60, 66. On May 19, the Reddam Trust

---

[3] All further dates shall refer to 1999 unless otherwise indicated.

opened a DB portfolio account. ER 65. On May 20, Appellant gave John Larson, a Presidio principal, trading power over his DB account. ER 65-66. Larson was an intelligent lawyer and former Senior KPMG Tax Manager. ER 188-89.

Larson was one of three principals of Presidio along with Robert Pfaff, a lawyer and former KPMG manager and Amir Makov, who had a Harvard MBA. ER 190-91. Each OPIS component occurred as designed. ER 197-99. Both Appellant, and his investment advisors at Presidio, intended that Appellant profit from the OPIS transactions. ER 158-59, 192-93, 195.

Appellant's OPIS investment involved the following undisputed events: On May 25, Appellant purchased a call option from Clara LLC for $150,000 ("Call Option"). The Call Option gave Appellant the right to require Clara LLC to either: (1) sell to Appellant fifty percent of the issued and outstanding shares of common stock that Clara LLC owned in Clara Ltd. at $500 per share; or (2) pay Appellant a cash settlement price based on the "Net Asset Value" of Clara Ltd. Appellant could exercise these rights beginning sixty days after May 25. ER 69.

On May 27, Appellant entered into a "Rate Swap Transaction" with Clara LLC ("Swap Agreement"). ER 70. Pursuant to the Swap Agreement, Appellant agreed to make two "Fixed Rate Payments" to Clara LLC totaling 3,274,692 Euros. The first was for 1,601,492 Euros and due on May 25. The second was for 1,673,200 Euros and due on July 6. ER 70.

On May 26, Appellant wired $6,000,000 to his DB Portfolio. ER 67. Presidio informed Appellant that $2,500,000 would purchase DB common stock and the remaining $3,500,000 was for the 1st and 2nd swap payments and the purchase of the call option in Clara Ltd. ER 67. The $6,000,000 was converted to Euros. ER 68. On May 27, Appellant purchased 45,834 shares of DB common stock at 52.15 Euros per share. ER 69. On May 28, Appellant made his first fixed rate payment and purchase of the Call Option. ER 71. Pursuant to the Swap Agreement, Clara LLC agreed to pay Appellant a "Floating Rate Payment" on August 23. ER 71-73. The Swap Agreement stated that the fourth Floating Rate Payment (*i.e.*, the payment in the amount of $622,500) was the minimum amount required to be paid by Clara LLC. ER 73.

On or about May 27, Cormorant and DB entered into a share option transaction and a loan transaction. ER 77. Cormorant borrowed around $50,000,000 from DB and used that money to purchase 919,931 shares of DB stock at a price of 51.95 Euros per share. ER 77. DB prepared its normal credit report for the loan transaction that Chief Operating Officer and Chief Lending Officer Douglas Lemons, as well as other DB officials, signed. The credit report stated that Appellant was executing the loan for investment and tax planning purposes. ER 178-80, 184, 202-09. Cormorant's loan was documented, collateralized, and had an interest rate like any other DB loan. ER 182-83. DB

7

also issued a stock trading advice showing that Cormorant purchased over 900,000 shares of DB stock rendering it the owner of those shares. ER 77, 185-86. Presidio instructed DB regarding the loan and securities purchases on behalf of their clients. ER 187.

On July 6, Cormorant sold 828,104 shares of DB stock at a price of 49.35 Euros per share yielding 40,866,932.40 Euros. ER 78. That same day, Cormorant sold 91,827 shares of DB stock at a price of 61.47 Euros per share generating 5,644,605.69 Euros. ER 78. On June 24, Appellant wired $625,000 to his DB Portfolio for the purchase of over-the-counter call options. ER 79. On July 6, Appellant entered into a share option transaction with DB. Per this agreement, Appellant purchased 919,931 call options from DB for 601,250 Euros. ER 79. On July 13, the call options were sold back to DB for 813,130 Euros. ER 80.

On August 6, believing the market had gotten ahead of itself, Appellant sold his 45,834 shares of DB stock after payment of fees for a net of 2,745,365.76 Euros. ER 80, 163. Appellant grossed hundreds of thousands of dollars from the various transactions associated with OPIS exclusive of fees. ER 278. If Appellant had continued his bullishness on DB stock past the summer of 1999 he would have made a substantial profit in 1999 over and above the fees he paid to execute OPIS. ER 281. Moreover, if the option transactions designed and implemented by KPMG, Presidio and DB had not been materially mispriced against Appellant's

8

financial interest, Appellant's profits upon his August exit would have been millions of dollars. ER 116-20.

Due to the sale of DiTech in 1999, on Schedule D of his 1999 income tax return prepared by KPMG, Appellant reported $48,489,549 of capital gain. ER 81. Appellant claimed $50,164,421 in capital losses from OPIS. ER 81.

On June 23, 2008, Appellee mailed a statutory Notice to Appellant alleging an $8,209,727 deficiency for 1999. ER 82. Appellant filed a timely petition in the Tax Court challenging the Notice. ER 82, 404-08. After a three day bench trial and briefing, the Tax Court held that Appellant's OPIS transaction lacked economic substance and should be disregarded for tax purposes. ER 39, 55. The court did not rule whether the tax code allows for the losses Appellant claimed. ER 39. Appellant filed this timely appeal.

## V.    SUMMARY OF ARGUMENT

The Tax Court erred in finding Appellant's OPIS transaction lacked economic substance. Specifically, the Tax Court misapplied the economic substance test. Instead of looking at whether, under the objective analysis, OPIS had *any* practical economic effects, the Tax Court erroneously found that despite OPIS' 25% chance of profitability, "a pretax profit on the investment was highly unlikely." ER 50. Further, the Tax Court applied the wrong legal standard to the subjective inquiry. Instead of focusing on whether Appellant had a business

9

purpose, it looked at whether taxes were the most important purpose for entering

OPIS – contrary to this Court's business purpose test. The court compounded its

mistakes by ignoring overwhelming evidence that Appellant subjectively desired to

profit from OPIS and clearly erred in finding that Appellant failed to engage in

prudent business techniques before entering into OPIS.

Contrary to the Tax Court's findings, the evidence shows that Appellant's

OPIS transaction had practical economic effects. It was an investment in DB stock

and options that would be profitable if DB securities appreciated. Appellant

researched the European bank market generally, and drilled down on DB

specifically before entering OPIS. OPIS had a reasonable possibility of producing

profits and there is ample evidence that Appellant reasonably believed his OPIS

investment would do so. Appellant was unaware of the mispricing of his options

and could not have reasonably detected it. The Tax Court clearly erred in finding

Appellant's OPIS transaction is devoid of economic substance and should be

disregarded for tax purposes. This Court should reverse.

## VI.    ARGUMENT

### A. STANDARD OF REVIEW

In reviewing the Tax Court's determination that a transaction lacks

economic substance, this Court reviews the factual determinations for clear error

and reviews the correctness of the legal standards and the application of the legal

standards to the facts found *de novo*. *Sacks v. Commissioner*, 69 F.3d 982, 986

(9th Cir. 1995). Under the clear error standard, an appellate court shall reverse the

Tax Court's finding when "left with the definite and firm conviction that a mistake

has been committed." *Wolf v. Commissioner*, 4 F.3d 709, 712 (9th Cir. 1993).

## B. THE TAX COURT ERRED IN FINDING THAT THE OPIS TRANSACTION LACKED ECONOMIC SUBSTANCE

In the Ninth Circuit a transaction may be disregarded for tax purposes if it is

a sham having *no* purpose or economic effects other than the creation of tax

deductions. *Bail Bonds v. Commissioner*, 820 F.2d 1543, 1548 (9th Cir. 1987)

(emphasis added). To determine whether a transaction has economic substance,

this Court focuses on (1) "the subjective aspect of whether the taxpayer *intended to*

*do anything other than acquire tax deductions* [a subjective analysis], and [(2)] the

objective aspect of whether the transaction had *any economic substance* other than

creation of tax benefits [an objective analysis]." *Sacks*, 69 F.3d at 98 (emphasis

added). This Court has held that courts should not apply a "rigid two step

analysis" but rather focus on whether the transaction had any practical economic

effects other than income tax losses. *Id.* at 988.

Appellee cannot disallow the tax benefits from a transaction with economic

effects merely because the Appellee does not like the results. The economic

substance doctrine is not a license for the Appellee to change the results of statutes

11

passed by Congress.  This is true even if a transaction had substantial tax benefits and the taxpayer was in part motivated by obtaining those benefits.

### 1. The Tax Court Misapplied the Objective Analysis in Concluding that OPIS Lacked Economic Substance

The Tax Court effectively accepted the findings of Appellant's expert, Dr. Ronald Miller, that approximately 23-25% of the time, Appellant would have made a profit net of all fees and before any tax benefits.  The Tax Court concluded, however, that this was not a reasonable opportunity for profit under the economic substance doctrine.  This conclusion is flawed as a matter of law.

The objective prong of the economic substance calculus focuses on whether a transaction had economic ramifications beyond the creation of tax benefits. *Casebeer v. Commissioner*, 909 F.2d 1360, 1365 (9th Cir. 1990).  The objective test asks whether "the substance of a transaction reflects its form and whether from an objective standpoint the transaction was likely to produce economic benefits aside from a tax deduction." *Id.* (quoting *Bail Bonds*, 820 F.2d at 1549).  "'A transaction has economic substance and will be recognized for tax purposes if the transaction offers a reasonable opportunity for economic profit, that is, profit exclusive of tax benefits.'" *Portland Golf Club v. Commissioner*, 497 U.S. 154, 170 n.19 (1990) (quoting *Gefen v. Commissioner*, 87 T.C. 1471, 1490 (1986)).

The test for economic substance does not ask whether the transaction was structured to have tax benefits, or whether the transaction absent tax benefits yields

12

the highest possible return, or even an average market return. "Where a transaction has economic substance and is economically realistic, it should be recognized for tax purposes, and the fact that a transaction is so arranged that the tax consequences are highly favorable to one of the parties affords the Commissioner no license to recast it into one of less advantage." *Washington Mut. Inc. v. United States*, 636 F.3d 1207, 1221 (9th Cir. 2011) (quoting *Lewis & Taylor, Inc. v. Commissioner*, 447 F.2d 1074, 1077 (9th Cir. 1971)). The test is whether the "transaction had *any* economic substance other than the creation of tax benefits." ER 44 (quoting *Sacks*, 69 F.3d 987).

Appellant's expert, Dr. Ronald Miller, performed a Monte Carlo simulation of his OPIS transaction, testing over 50,000 possible scenarios for the price of DB stock. ER 278. Dr. Miller testified that approximately 23-25% of the time Appellant would have made a profit net of all fees and before any tax benefits. ER 105-07, 249, 279-80. Based on the simulation, Appellant's OPIS transaction could yield profits of approximately EUR 3 million to EUR 6 million. ER 287, 289. While these returns were in the 95th to 99th percentile, they are significant given that Appellant's overall investment was approximately EUR 5.7 million and the total term of the investment was approximately three months. ER 279.

Appellee's expert, Dr. Lawrence Kolbe disputed this conclusion, arguing that the probability of profit would be "more in the 10 to 12% range than in the 23

13

to 25% range." ER 48. The Tax Court did not decide between these two views, instead, holding that regardless of which view is correct, the potential for profit was not sufficient to establish economic substance. ER 48-49. In effect, therefore, the Tax Court held that a 23-25% chance of profit was not sufficient as a matter of law. This conclusion, subject to *de novo* review, is clearly incorrect. As the Tax Court stated, the question is whether the "transaction had <u>any</u> economic substance other than the creation of tax benefits." ER 44. It cannot be said that a 23-25% chance of profit is not meaningful and has no substance whatsoever or is remote.

Rather than applying the proper legal standard, the Tax Court gave substantial weight to Dr. Miller's finding that "[o]n average, and at the median, the transaction generates a substantial loss." ER 50; *see also* ER 49. However, the proper test is not whether on average a transaction is profitable, but whether a transaction has *any* practical economic effects. Here, the OPIS transaction had the opportunity to be profitable 25% of the time. Appellee's expert confirms that OPIS had a reasonable opportunity for profit. Figure 21 of Dr. Kolbe's report shows the net gain or loss from the transaction, compared to an alternative strategy, based on Dr. Kolbe's assumed price path for DB stock. ER 393. Figure 21 shows that in a substantial number of cases, the transaction would have been profitable and in some cases, highly profitable. Moreover, across the entire range of prices for DB stock, the returns on the strategy reflected changes in the price of DB stock

14

– as the stock price went up, so did the returns from the strategy.  Dr. Kolbe's own figure shows that the returns from the transaction were essentially similar to, but had a slightly lower return than, a transaction that he agrees had economic substance.[4]  Figure 21 proves that OPIS had economic substance.

OPIS' profit potential was entirely different than the returns in cases where this Court found no economic substance.  In *Bail Bonds* this Court affirmed a finding that a loan was a sham:  "[t]here is *no evidence* that Bail Bonds could have benefited economically from the transaction, aside from obtaining tax deductions." 820 F.2d at 1550 (emphasis added).  This Court also affirmed the Tax Court's determination in *Casebeer v. Commissioner* that the computer sale-leaseback investments were shams, reasoning that the record was clear that the investors had nothing at risk and nothing to gain except tax benefits.  909 F.2d at 1368.  Unlike *Bail Bonds* and *Casebeer*, Appellant had an opportunity to make a substantial profit, indeed millions, had he continued his bullish bet on DB past the summer of 1999.  *See* ER 281-82.  Clearly OPIS had practical economics effects.

The Tax Court also relied on Dr. Kolbe's conclusion that options purchased for Appellant were materially mispriced in holding that OPIS had no economic substance.  ER 47.  The court noted that the mispricing caused Appellant to "remain[] in an economically untenable position with little hope of profit before

---

[4] Note also that Figure 21 shows a lower return than was possible because it does not include the Asian and fade-in options.  *See* ER 393.

taking into account the investment's tax benefits." ER 48. This finding is clear error contradicting undisputed evidence accepted by the Tax Court that Appellant could have substantially profited even with the mispricing.

Moreover, that a large bank mispriced complex derivatives to benefit itself to the detriment of its customer is not evidence that a transaction is a sham. Dr. Kolbe testified that had the options been fairly priced, Appellant would have earned approximately EUR 2.7 million from his OPIS investment in DB stock in a period of approximately three months – a return of over 100%. ER 116-20. This is three times more money than Appellant would have earned if he had simply invested in DB stock. ER 121. Clearly the structure of the investment was well conceived and would have allowed Appellant to earn very high returns. The sole reason Appellant did not capture these enormous returns was because professionals he relied on took advantage. In sum, Appellant's OPIS transaction had a 25% chance of profitability. Even with the mispricing of options, OPIS had the opportunity of returns up to 100% over a short period of time. Contrary to the Tax Court's conclusions, the law does not require an investment to be profitable on average, or at the median, to have economic substance. The Tax Court erroneously found under an objective inquiry the OPIS transaction lacked economic substance.

### 2. The Tax Court Erred In Finding Appellant Did Not Have a Business Purpose for Entering Into the OPIS Transaction

16

Under the subjective inquiry, also known as the business purpose test, the court determines whether the taxpayer had a business purpose for engaging in the transaction apart from tax avoidance. *Casebeer*, 909 F.2d at 1363-64 (citing *Bail Bonds*, 820 F.2d at 1549). The business purpose test examines the factors that motivated the taxpayer to enter the transaction. *Id.*; *see also Rice's Toyota World v. Commissioner*, 752 F.2d 89 (4th Cir. 1985). There need not be a single purpose behind a transaction. All that is required is that the taxpayer has a business purpose other than a desire to gain tax benefits. *See Casebeer*, 909 F.2d at 1363-64 (citing *Bail Bonds*, 820 F.2d at 1549).

The Tax Court erred when it applied the subjective test. It applied the wrong legal standard leading to conclusions that are incorrect as a matter of law. Moreover, the Tax Court ignored overwhelming evidence that Appellant subjectively desired to profit from the DB securities transactions underlying OPIS, thus leading to factual conclusions that are clearly erroneous.

a.  The Tax Court Applied the Wrong Legal Standard

The subjective test only requires that the taxpayer have a business purpose and not be motivated solely by tax benefits. *See Casebeer*, 909 F.2d at 1363-64 (citing *Bail Bonds*, 820 F.2d at 1549). Instead of applying this test, the Tax Court looked at whether taxes were the most important purpose, a consideration entirely separate from whether there was a business purpose. Holding for Appellee, the

17

court stated "It is apparent that petitioner was engaged in a course of action with the principal and overriding purpose of reducing or eliminating tax on a significant capital gain." ER 52. This holding is irrelevant to the inquiry required by this Court. What matters is whether there was a business purpose, not whether there was also a tax purpose or even whether that tax purpose was the main purpose.

The Tax Court continued this error in finding that the OPIS transaction only became an appealing option for petitioner when the tax benefits became apparent. ER 52. Again, the Tax Court merely found that there was a tax motivation, not that there was no business purpose. For example, a corporate merger may have a strong business purpose but may not take place absent the tax benefits, such as qualifying for tax-free treatment. That there are important tax benefits or that the transaction is only appealing given the tax benefits says nothing about whether there is a business purpose. Similarly, the Tax Court noted that "Petitioner, on brief, even admits that he had a 'substantial tax motivation.'" ER 52. This again is irrelevant to the inquiry required by this Court.

The Tax Court tried to correct this mistake by subsequently noting that the Appellant failed to convince the court that he had "any purpose other than to avoid income tax." ER 53. However, the Tax Court's cited evidence confuses tax motivations with business motivations, illustrating that the Tax Court continued to apply the wrong legal standard. In particular, the Tax Court held that relying on

18

the opinion letters provided by KPMG was insufficient, and that Appellant should have hired competent counsel capable of analyzing the very technical aspects of the transaction. ER 52, 54. These opinion letters, however, were about the tax aspects of the transaction. Competent counsel would have advised him on the tax or other legal aspects of the transaction, not on his business purpose, which is his own. Whether relying on the advice of his accountant for tax analysis is appropriate and whether Appellant should have sought legal advice are inquiries unrelated to whether there was a business purpose, illustrating the Tax Court's confusion of a tax motivation with the lack of a business purpose.

      b. <u>A Finding that Appellant had No Business Purpose Under the Correct Legal Standard Would be Clearly Erroneous</u>

While the Tax Court decision must be reversed because it applied the wrong legal standard, if the Tax Court opinion is read to apply the correct legal standard, its findings would be entirely unsupported by the record and clearly erroneous.

The best evidence of the Appellant's state of mind was his testimony – a first-hand recounting of what Appellant thought when introduced to OPIS. When asked if he was focused on whether or not he could make money from the investment, Appellant's unimpeached sworn testimony was that he desired and intended to profit from OPIS and his research on the market and the DB stock, addressed in detail *infra*, support his testimony. ER 154-59. Even if there were reason to doubt Appellant's recollection, which there is not, common sense as well

19

as Appellant's actions, the outside manifestations of his intent, support the notion that Appellant desired to generate gains from his DB positions.

The Tax Court, despite the weighty direct and circumstantial evidence of Appellant's profit motive, held that Appellant did not have a business purpose other than tax reduction. In doing so, the court misstated the applicable legal standard and made unsupported factual determinations. The court primarily relied on a holding that Appellant had substantial tax motivations, which is a separate issue. ER 52-53. What matters is whether the Appellant also had a business purpose. Planning to obtain favorable tax consequences does not mean that the transaction lacks a business purpose. *Frank Lyon Co. v. United States*, 435 U.S. 561, 580 (1978).

The Tax Court also found: (i) Appellant failed to engage in prudent business techniques to investigate the OPIS transaction deeming his reliance on KPMG, Presidio and his own research was not reasonable; and (ii) Appellant could have discovered the options were materially mispriced. These findings also are not supported by the record and are clear error.

       i.    *Appellant Was Prudent in Evaluating the Potential Profitability of the DB Securities Transactions Involved in OPIS*

The Tax Court found that KPMG marketed OPIS as an investment in foreign bank stock in addition to a tax strategy. ER 7, 194-95, 210-24. It also found that Appellant's depiction of the marketing credible. The court stated "I don't think

20

that there's a major dispute about what was represented to Mr. Reddam … in any event, as to these two witnesses [Hasting and Steven Buss from Presidio] I would represent to you that I accept his testimony." ER 201.  Nevertheless, the court rejected Appellant's profit motive for entering into the OPIS transaction finding he failed to fully investigate the profitability of the transaction and he also should have hired outside counsel to review it.  ER 52.

Contrary to the court's unsupported finding, Appellant researched the profit potential of DB securities.  He researched the stock and the European market to determine whether investing in DB stock was sound.  He reviewed Bloomberg charts and a number of materials that Hasting had given him on the market and DB stock.  ER 155-57.  From this research, he found that DB stock had had a steady pattern of gains over the past couple of years and there was every reason to believe DB was a stable company and the stock would continue to rise.  ER 156-57.  In addition, KPMG and Presidio marketed OPIS as an investment with the opportunity of substantial returns and Hasting himself was very bullish on DB securities.  ER 154, 192-93, 195.  From this research and further diligence, Appellant concluded that DB securities were a good investment.  ER 155-57, 160-61.  Appellant's business purpose was to profit from the appreciation of DB stock and options.  Had Appellant not concluded that the market had gotten ahead of itself and continued his bullish bet on DB stock past the summer of 1999, he would

have made large returns as the stock continued to rise. ER 196, 281. Appellant's profit motive ironically led to his making far less money than he would have had he terminated the transaction at the end of the tax year.

In *Altman v. Commissioner*, this Court reversed the Tax Court's finding that the taxpayers were negligent in claiming a tax loss for their investment in CAL-NEVA, a limited partnership that provided a number of tax shelter benefits, reasoning that the taxpayers' negligence was not supported by the record. 469 Fed. Appx. 565, 2012 WL 605699, at *1 (9th Cir. 2012). Although *Altman* dealt with a negligence penalty, the standard of review for the Tax Court's factual determinations was clear error, and this Court's application of that standard is instructive here. The Tax Court in *Altman* held that although the taxpayer conducted his own research before investing in CAL-NEVA, he failed to demonstrate he and his wife sought independent advice from a tax advisor before entering into the investment and claiming a deduction for a loss relating to that investment, and thus, was liable for negligence penalties. *Altman v. Commissioner*, T.C. Memo 2008-290, 2008 WL 5330803, *6-7 (2008), *rev'd*, 469 Fed. Appx. 565, 2012 WL 605699 (9th Cir. 2012). The Tax Court found that at least three times in the private placement memorandum that was given to prospective investors of CAL-NEVA, the investors were told to consult their own tax advisers regarding the tax implications of the investment and therefore, it was

not reasonable to rely on his professional tax preparer as there was no evidence he was ever given the private placement memorandum or conducted any research into the nature of the investment. *Id.* at *2, 4. This Court held that the Tax Court clearly erred in concluding that the taxpayer's own thorough investigation was insufficient to permit him to make a reasonable decision that the project had some fair prospect of profitability and clearly erred in concluding taxpayer's consultation with his tax preparer was inadequate. *Altman*, 469 Fed. Appx. at *1.

Similarly here, the Tax Court clearly erred in finding that Appellant did not engage in prudent business techniques to investigate OPIS, he should have hired independent counsel, and his reliance on professional advisors was unreasonable. As indicated *supra*, the evidence shows that Appellant conducted his own research of the market and stock to determine whether investing in DB stock was prudent. ER 155-58. Appellant reviewed numerous materials all of which persuaded him that DB stock would continue to rise and overall would be a fruitful investment.

In addition, as indicated *supra*, the Tax Court misinterpreted the testimony of Carnahan who recommended that Appellant hire counsel to review the tax effects of OPIS, with the notion of hiring counsel to review the investment component. ER 54-55. Carnahan never testified that he advised Appellant to seek independent counsel on the profitability of OPIS. It was not necessary for Appellant to seek independent counsel to review the profitability of OPIS as that

23

would have added nothing of value either regarding the share price history, which appellant already had, or the pricing of exotic options that would not be in the realm of expertise of a licensed legal practitioner. *See* discussion *infra* at 28-29. There is no suggestion in the record that Appellant should have, or could have, sought legal counsel to review the profitability of OPIS. The Tax Court's finding was clearly erroneous.

The Tax Court cites *Pasternak v. Commissioner* in support of its finding that Appellant lacked due diligence in researching OPIS. ER 54. That case is distinguishable. In *Pasternak*, the taxpayers invested in co-tenancies that leased master recordings of various music artists for the purpose of marketing them. The taxpayers claimed investment tax credits and business expense deductions from the investment and the IRS disallowed the deductions and credits on the grounds that the transactions had no economic substance and were entered into solely for tax benefits. 990 F.2d 893, 895-97 (6th Cir. 1993). The Sixth Circuit agreed with the Tax Court's determination that the transactions lacked economic substance. The court reviewed the partnership's motive for entering into the transaction under the subjective business purpose prong. It noted that the co-tenancy operator failed to carry out the terms of the lease agreements, failed to keep copies of documents he signed, failed to keep books and records or open bank accounts for the co-tenancies as specified in the operating agreements, and failed to purchase insurance

24

for the master recordings which were purportedly worth millions. *Id.* at 901. The Six Circuit affirmed the court's findings that the co-tenancy operator's inattentiveness, lack of records and failure to carry out the terms of the agreements was consistent with tax-motivated transactions with no business purpose. *Id.*

*Pasternack* cannot be further from the facts in this case. There is no evidence in the record that Appellant was inattentive to the substance or documentation of the OPIS transaction. Not only did Appellant conduct research with regard to OPIS, but he also followed the progress of DB stock after investing in OPIS. ER 163-64. Like the taxpayers in *Altman*, Appellant's research and diligence with regard to OPIS was sufficient for him to decide whether there was a prospect of profitability and did not require the review of outside counsel.

Further, it would not have been unreasonable for Appellant to solely rely on KPMG for investment advice. Appellant had utilized KPMG for his personal and business accounting needs for years and had hired several former KPMG employees. ER 133-36. Carnahan, whom Appellant later hired as president of DiTech, introduced Appellant to Hasting, a KPMG tax partner who was both a CPA and a lawyer. ER 150. Appellant had tremendous trust in Carnahan who had vouched for Hasting. While Appellant described Hasting as "kind of salesy," he believed Hasting was very competent and had no reason to question Hasting's judgment on financial issues. ER 162.

The Tax Court cited *Blum v. Commissioner* to support its holding that Appellant lacked a subjective desire to profit. The investment diligence by the *Blum* taxpayer is vastly disparate from Appellant's. In holding that Blum's OPIS transaction failed the subjective inquiry, the Tax Court found that Blum's actions during and after the transaction conflict with his contention that he intended to make a high-yielding investment. *Blum v. Commissioner*, T.C. Memo 2012-16, 2012 WL 129801, *11 (2012). The court reasoned that Blum participated in the transaction after two hour-long meetings with Hasting and did not review any written prospectus or other documentation before entering into the transaction; he did not perform an economic analysis, research the transaction or ask his existing investment advisers to review it; and he did not track his investment. *Id.* at *3, 11. The court also relied on Blum's representations in his lawsuit against KPMG where he characterized the investment as a "tax strategy." *Id.* at *11. The court disbelieved Blum's testimony that he had no interest in a tax shelter when he met with Hasting as it was contradictory to the evidence at trial. *Id.* at *10.

Unlike Blum, Appellant was candid regarding his intentions for entering into OPIS – he was interested in reducing his tax liability and making a profit. ER 147-49. The Tax Court found that KPMG marketed OPIS as an investment in foreign bank stock as well as a strategy to minimize taxes. ER 7. And the Tax Court found Appellant's testimony regarding what was represented to him about OPIS as

credible. ER 200-01. Appellant did not have only two brief meetings with Hasting before engaging in OPIS, but rather, had a series of meetings throughout the year with Hasting and other KPMG representatives before deciding to invest in it. ER 150-55. After Appellant's own research and KPMG's and Hasting's representations, he determined DB was the best foreign bank stock to invest in. He also tracked the progress of the stock unlike Blum, and although there were prearranged steps for the transaction, Appellant had sole control over when to sell the stock. ER 163-64. Further, he viewed the national prestigious law firm that issued the "more likely than not opinion," as the lawyers for the OPIS transaction. ER 167. Appellant's characterization of OPIS as a "formula or recipe" does not negate his mixed intentions for entering into the investment as the Tax Court erroneously found. ER 54. The record shows Appellant's intent to profit from OPIS. Thus, the Tax Court clearly erred in finding Appellant did not have a business purpose for entering into OPIS.

In sum, Appellant engaged in the following prudent business techniques that evidence his profit motive, including: (1) researching the European market and DB stock; (2) tracking DB stock after investing in OPIS; and (3) reasonably relying on KPMG, a firm he had an established fiduciary relationship with as well as KPMG representative Hasting who Carnahan vouched for, who was a lawyer and a CPA, and who represented to Appellant that an investment in foreign bank stock and

27

options could have profitable returns along with tax benefits. The evidence overwhelmingly shows Appellant's intent to profit from the OPIS transaction.

> ii.  *The Tax Court Erred in Finding Appellant Should Have Known the Options Were Materially Mispriced*

Respondent's expert, Dr. Kolbe, testified that the options were materially mispriced to Appellant's detriment. This mispricing says nothing about Appellant's subjective motivation to make a profit because he did not know about the mispricing. One does not fail to intend to profit even if one inadvertently enters into a transaction that has been rigged without one's knowledge. The Tax Court in an unavailing attempt to get around this logic, held that Appellant should have known the options were materially mispriced to his detriment: "Petitioner is a sophisticated businessman and had ample opportunity to fully investigate the transaction, by either comparing the price of the transaction on the open market or hiring outside counsel to analyze the transaction." ER 54-55. There is no support in the record for this holding.

The options in Appellant's OPIS transaction were exotic options with no general market. ER 115. Appellant could not have priced the options by researching commonly available sources of option values, or by hiring an outside lawyer to analyze the transactions. Instead, the task of valuing the options was very difficult and time intensive. ER 108-09, 114-15. It took Dr. Kolbe's expert mathematicians and economists between one and two days each for every option

28

reviewed. ER 110-11. Overall, Dr. Kolbe and his team spent hundreds of hours worth of time and hundreds of thousands of dollars to determine the options were mispriced to Appellant's detriment. ER 114. While Dr. Kolbe speculated on whether Appellant could have received competing bids from banks on these specialized exotic options, Dr. Kolbe has never valued exotic options this way. ER 121-22. The evidence at trial unmistakably shows that Appellant was unaware and could not have reasonably known the options were mispriced to his detriment substantially reducing his chance of profiting. ER 113-14, 165-66. Appellant's fiduciaries at KPMG and Presidio had a duty to advise him if the options they structured for him were substantially overpriced. *See* 15 U.S.C. § 80b-6. No such advice was ever rendered.

### C. IF THE COURT FINDS THAT THE TAX COURT CLEARLY ERRED ON EITHER ECONOMIC SUBSTANCE PRONG, *DE NOVO* REVIEW IS REQUIRED

If the Court finds that the Tax Court erred in its findings with regard to either prong of the economic substance doctrine, this Court should evaluate Appellant's OPIS transaction *de novo*. *See Sacks*, 69 F.3d at 986. The record shows that Appellant's intent was not only to receive the tax benefits from OPIS, but also to profit from the investment. Appellant's OPIS transaction had the opportunity to be highly profitable and would have been had Appellant held onto his DB shares a few months longer during the 1999 tax year. Appellant's decision

investment that in fact made, exclusive of fees, hundreds of thousands of dollars in a few short months.  The Tax Court clearly erred in finding Appellant's OPIS transaction lacked economic substance.  This Court should accordingly reverse.

## VII.    CONCLUSION

Based on the foregoing, the Tax Court clearly erred in holding that Appellant's OPIS transaction lacked economic substance.  The record unequivocally shows that Appellant not only intended to profit from the OPIS transaction, meeting the subjective prong, but his OPIS transaction was profitable, meeting the objective prong.  Because Appellant's OPIS transaction had economic substance, the Court should reverse.

## VIII.    STATEMENT CONCERNING ORAL ARGUMENT

Appellant requests oral argument that will permit counsel to address the factual and legal questions this case presents, and to respond to the Court's queries.

Dated: October 9, 2012                                            Respectfully submitted:

                                                    By:    _____
                                                            David W. Wiechert
                                                            Jessica C. Munk

                                                            Attorneys for Petitioner-Appellant
                                                            John Paul Reddam

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32 (a)(5),(6) and (7) and Ninth Circuit Rule 23-1, I certify that the attached Opening Brief is proportionally spaced, has typeface of 14 points or more, and contains 7,733 words.

Dated: October 9, 2012

Jessica C. Munk
Attorney for Petitioner-Appellant
John Paul Reddam

## CERTIFICATE OF RELATED CASES

Counsel certifies that she is unaware of any cases related to this matter.

Dated: October 9, 2012

Jessica C. Munk
Attorney for Petitioner-Appellant
John Paul Reddam